## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIMOTHY TYLER; TERRI TYLER; TIM & TERRI FAMILY LP; TYLER 5 FAMILY LP; RODNEY MOWRY; and DIANNA MOWRY<br><br>Plaintiffs,<br><br>v.<br><br>CHESAPEAKE APPALACHIA, L.L.C.; CHESAPEAKE ENERGY CORPORATION; and CHESAPEAKE ENERGY MARKETING, L.L.C.<br><br>Defendants. | Civil Action No.<br><br>Class Action Complaint |

Plaintiffs Timothy Tyler; Terri Tyler; Tim & Terri Family LP; Tyler 5 Family LP; Rodney Mowry; and Dianna Mowry (collectively "Plaintiffs") bring this claim against Chesapeake Appalachia, L.L.C., Chesapeake Energy Corporation, and Chesapeake Energy Marketing, L.L.C. (collectively the "Chesapeake Defendants" or "Defendants") on behalf of themselves and all those similarly situated.

## NATURE OF THE SUIT

1.    This is a class action seeking damages for the Chesapeake Defendants' illegal conduct. As Plaintiffs allege more fully below, the Chesapeake Defendants exploit Plaintiffs and other Pennsylvania landowners to generate revenue and profits for themselves while cutting Plaintiffs and others situated similarly to Plaintiffs out of money they are entitled to under terms of oil and gas leases.

2.      Plaintiffs, and others similarly situated, hold interests in standard form oil and gas leases entered with the expectation that the lessee's production of their gas would generate royalty payments.  Thus, Plaintiffs would share in the revenues that energy companies generated from the sale of Plaintiffs' natural gas.  Consistent with that expectation, the leases contain uniform language prohibiting the lessee from taking deductions for post-production costs.

3.      There is no commercial market at the wellhead for gas extracted from Plaintiffs' properties.  Before the gas can be sold, post-production services such as compression, dehydration, gathering, and transportation of the natural gas are necessary to render it ready for sale.  The gas is generally moved further along the interstate pipeline for sale in higher priced end-user markets.

4.      Ignoring the fact that the Plaintiffs' leases prohibit deductions from royalty payments for post-production services, the Chesapeake Defendants generated a ploy to enrich themselves at the expense of Plaintiffs and all members of the Deductions Class as defined herein.

5.      In this scheme, Chesapeake Appalachia, L.L.C. ("CHK Appalachia"), the subsidiary that holds the leases and produces gas from leased properties, transfers title to the gas to an affiliated company, Chesapeake Energy Marketing, L.L.C. ("CEML").  CEML then markets and sells the gas to third parties in the interstate pipeline system.  Despite the fact that the gas is sold downstream of the wellhead, and despite the fact that the leases prohibit deductions for post-production costs, CHK Appalachia takes deductions against the royalties payable to Plaintiffs and members of the Deductions Class, charging for post-production services as though its transfer to its sister company, which like CHK Appalachia, is a wholly owned

2

subsidiary of Chesapeake Energy Corporation ("CHK"), is a "sale" for purposes of calculating royalties.

6.     CHK, the ultimate parent of CHK Appalachia and CEML, unjustly benefits from these improper deductions because it uses its subsidiaries to depress or eliminate royalty payments to Plaintiffs and those similarly situated while generating revenues and profits for itself from the sale of the natural gas extracted from their properties and sold to third parties in the interstate pipeline system.[1] Thus, CHK makes money at the expense of Plaintiffs and those similarly situated by minimizing—and in some cases entirely eliminating—royalty payments to Plaintiffs, which are swallowed up by the deductions for purported post-production services.

7.     In fact, under CHK's scheme, there are times the deductions are so extensive that Plaintiffs *would actually owe money to CHK above the amount of their royalties* for post-production services.[2] Put differently, CHK claims that despite the language of the lease

---

[1] As explained more fully below, CHK treats its production and sales operations as an integrated, unitary business.

[2] This is a potential future liability to landowners under CHK's current accounting practices. CHK's accounting for a named Plaintiff's deductions is instructive in this regard. CHK initially paid royalties to named Plaintiff without deductions. *See* December 21, 2011 Statement showing no deductions for first four months, attached hereto as Exhibit A. CHK proceeded to deduct post-production costs retroactively by simply taking those costs from future royalties, informing Plaintiff of this retroactive taking via letter stating "We will also recoup the [post-production] costs that have been suspended back to the date of the *Kilmer* decision." February 21, 2012 Letter from Mobley to Tyler, attached hereto as Exhibit B. Although CHK has at present "zeroed out" Plaintiffs' royalty payments, without this Court's intervention there is nothing to prevent CHK from retroactively deducting the purported liability it has created from future royalties.

prohibiting deductions, it is free to produce Plaintiffs' gas without paying them royalties if post-production costs exceed the price of the gas.

8.      In perpetrating this scheme, CHK profits by using its subsidiary companies to deprive Plaintiffs and others of the benefit of the royalties they expected when they signed the leases. To be sure, no one would sign an oil and gas lease promising the payment of royalties if that promise was so meaningless that it could be turned on its head and result in the lessee *taking the lessor's gas and demanding payment for it*.

9.      This lawsuit seeks legal and equitable relief to recover the funds due to Plaintiffs and those similarly situated that the Chesapeake Defendants have wrongfully appropriated to themselves through this scheme and to prevent them from exploiting landowners through the continuation of this scheme in the future.

10.      At a minimum, Plaintiffs seek to enjoin the Chesapeake Defendants' most egregious misconduct. That is, Plaintiffs seek to enjoin the Chesapeake Defendants from producing Plaintiffs' gas when Plaintiffs will receive no benefit from that production (*i.e.*, when the Chesapeake Defendants assess negative royalties due to, *inter alia*, improper post-production charges).

11.      In addition, the Tylers are members of a group of approximately 100 lessors whose leases are pooled in sixteen separate gas wells, all of whom joined together to review and audit the Chesapeake Defendants' records to ensure that their royalty payments were being calculated correctly (the "Audit Group"). The Audit Group engaged an accountant knowledgeable about the energy industry and royalty payments to perform the audit, which revealed that the Chesapeake Defendants were miscalculating royalties even assuming that their

position that they are permitted to take deductions for post-production costs is correct, which it is not. The miscalculations are attributable to the Chesapeake Defendants' underreporting of volumes and prices. The Chesapeake Defendants have refused to correct the problems identified by the Audit Group.

## THE PARTIES

12.     Plaintiffs Timothy and Terri Tyler reside at 2262 SR 3001 Meshoppen, Pennsylvania 18630. They are citizens of Pennsylvania.

13.     Plaintiff Tim & Terri Family LP is a Pennsylvania limited partnership with a principal place of business at 2262 SR 3001, Meshoppen, Pennsylvania 18630. Timothy and Terri Tyler are the general partners and the limited partners of Tim & Terri Family LP.

14.     Plaintiff Tyler 5 Family LP is a Pennsylvania limited partnership with a principal place of business at 540 SR 3005, Meshoppen, Pennsylvania 18630. Brian and Teresa Tyler are the general partners and the limited partners of Tyler 5 Family LP. They reside at 540 SR 3005 Meshoppen, Pennsylvania 18630. They are citizens of Pennsylvania.

15.     Plaintiffs Rodney Mowry and Dianna Mowry reside at 233 Mowry Road, Meshoppen, Pennsylvania 18630. They are citizens of Pennsylvania.

16.     Defendant Chesapeake Appalachia, L.L.C. is a subsidiary of Chesapeake Energy Corporation. It is an Oklahoma limited liability company with a principal business address of 6100 North Western Avenue, Oklahoma City Oklahoma 73118, and registered agent at 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

17.     Defendant Chesapeake Energy Corporation is an Oklahoma corporation with a principal business address of 6100 North Western Avenue, Oklahoma City Oklahoma 73118, and registered agent at 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

18.     Defendant Chesapeake Energy Marketing, L.L.C. is an Oklahoma limited liability company with a principal business address of 6100 North Western Avenue, Oklahoma City Oklahoma 73118, and registered agent at 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.  In the alternative, this Court has jurisdiction under the Class Action Fairness Act because, on information and belief, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and because this is a class action in which a member of the class is a citizen of a state different from the defendant Chesapeake entities.  *See* 28 U.S.C. § 1332(d)(2)(A).

20.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c)(2) because Defendants do business in this District and are subject to personal jurisdiction in this District, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTS

### THE MARCELLUS REGION AND THE LEASES

21.     The underlying claims involve oil and gas leases entered into by landowners in the Marcellus region, an area comprising numerous counties in Pennsylvania.

PHDATA 5628181_1

22.     The natural gas rich Marcellus Shale formation spans approximately 95,000 square miles from northern Pennsylvania to central West Virginia. *See* http://www.chk.com/operations#/pennsylvania.

23.     CHK reports that it "has approximately 9 trillion cubic feet of net recoverable resources in the Marcellus shale, with a 55% rate of return on reinvested capital." *Id.*

24.     In 2008, CHK was the largest leasehold owner in the Marcellus Shale play. *See, e.g.*, CHK 2008 Annual Report at 14 (available for viewing and downloading at http://www.chk.com/investors/financial-information). On information and belief, CHK is still the largest leaseholder in the Marcellus Shale play.

25.     The Marcellus shale region has attracted a great deal of energy industry attention because it can generate large profits for energy companies. According to CHK, the proximity of the Marcellus shale formation to major East Coast natural gas markets "offers producers the best profit margins in the nation." *Id.* These profit margins depend on many factors, including the price of gas and the share of revenues paid to royalty owners.

26.     Plaintiffs Tim and Terri Tyler, Tim & Terri Family LP, and Tyler 5 Family LP own interests in Paid Up Oil and Gas Leases originally entered on January 2, 2008, with Elexco Land Services, Inc. ("Elexco"). True and correct copies of the leases are attached as Exhibit C.

27.     On January 24, 2008, plaintiffs Rodney and Dianna Mowry entered into a Paid Up Oil and Gas Lease with Elexco. A true and correct copy of the lease is attached as Exhibit D.

28.     The Plaintiffs' Elexco leases are form leases. In all material respects, their terms are identical. They contain uniform provisions relating to the calculation of royalties that apply

to all lessors who are parties to leases with identical terms and specify the share of revenues to be paid to royalty owners.

29.     Each of the leases contains the following language concerning payment of royalties for any oil and gas substances produced from the properties covered by the leases:

> For all Oil and Gas Substances that are produced and sold from the leased premises, Lessor shall receive as its royalty one eighth (1/8th) of the sales proceeds actually received by Lessee from the sale of such production, less this same percentage share of all Post Production Costs, as defined below, and this same percentage share of all production, severance and ad valorem taxes.  As used in this provision, Post Production Costs shall mean (i) all loses of produced volumes (whether by use as fuel, line loss, flaring, venting or otherwise) and (ii) all costs actually incurred by Lessee from and after the wellhead to the point of sale, including, without limitation, all gathering, dehydration, compression, treatment, processing, marketing and transportation costs incurred in connection with the sale of such production.  For royalty calculation purposes, Lessee shall never be required to adjust the sales proceeds to account for the purchaser's costs or charges downstream of the point of sale.

30.     All the leases contain, in an addendum, a clause at paragraph 17 that overrides and modifies the royalty term above (the "Addendum Clause").  The Addendum Clause provides:

> Royalties shall be paid *without deductions for the costs of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the oil and/or gas produced from the lease premises ready for sale or use*.  All oil and/or gas royalty *shall be delivered free of cost* into the tank or pipeline (for oil) and *into the pipeline* (for gas) with the exception of Lessor's prorated share of taxes, measured by volume, on the oil and/or gas royalty.

(Ex. A, Addendum ¶ 17; Ex. B., Addendum ¶ 17 (emphasis added).)

PHDATA 5628181_1

31.     In connection with the execution of these leases, the Elexco representatives, and specifically Pete Strineka, attended a meeting prior to signing the leases at issue.  The purpose of the meeting was to have Mr. Strineka explain the meaning of each clause in the lease to Tim, Brian, Theresa, and Nancy Tyler.  At this meeting, Mr. Strineka told Tim, Brian, Theresa, and Nancy Tyler that the Tylers were extremely lucky to have the Addendum Clause in their leases.  Mr. Strineka told the Tylers that the Addendum Clause explicitly prohibited the lessee from deducting any post-production costs from their royalty payment and that the Tylers would receive royalties based on 100% of the revenue from the sale of their gas.

32.     Mr. Strineka made substantially identical—and therefore apparently scripted—representations to the Mowrys about the meaning and significance of the Addendum Clause in connection with the execution of their lease.

33.     Each of the leases is assignable and states in pertinent part:

> The interest of either Lessor or Lessee hereunder may be assigned,
> devised or otherwise transferred in whole or in part, by area and/or
> by depth or zone, and the rights and obligations of the parties
> hereunder shall extend to their respective heirs, devisees,
> executors, administrators, successors and assigns.

34.     On information and belief, CHK Appalachia was assigned or otherwise acquired the Plaintiffs' leases from Elexco.

35.     Under Pennsylvania law, an oil and gas lessee is subject both to an implied duty of fair dealing and an implied covenant to develop and operate the leasehold for the mutual benefit of the lessor and lessee.

PHDATA 5628181_1

36.     The leases recognize that such implied covenants exist and are applicable to the lessee. *See, e.g.*, Ex. A at ¶ 11 ("***Lessee's obligations*** under this lease, whether express or ***implied***, shall be subject to all applicable laws, rules, regulations and orders of any governmental authority having jurisdiction . . . . Lessee shall not be liable for breach of any provisions or implied covenant of this lease when drilling, production or other operations are . . . prevented or delayed [by enumerated causes].").

37.     Accordingly, the leases require CHK Appalachia to act in good faith and for the mutual benefit of the lessor and lessee, taking the lessors' interests into consideration. The Chesapeake Defendants have flouted these obligations by improperly charging deductions for post-production costs and appropriating benefits to themselves at the expense of Plaintiffs and all members of the Class.

## CHESAPEAKE'S OPERATIONAL STRUCTURE AND IMPROPER DEDUCTIONS OF POST-PRODUCTION COSTS FROM ROYALTIES UNDER THE LEASES

38.     CHK, through its wholly-owned subsidiary CHK Appalachia, owns interests in leases covering tens of thousands of acres in the Marcellus region and, through its wholly owned subsidiary CEML, markets gas it produces from the lands it has under lease. Among other things, CHK represents in filings with the Securities and Exchange Commission that it owns or controls businesses that allow it to extract gas from the Marcellus shale and, ultimately, sell the gas into lucrative citygate markets at the end of interstate pipelines. *See, e.g.*, CHK 2014 Report on Form 10-K at 1, 11-12 (available for viewing and downloading at http://www.chk.com/investors/financial-information).

39.     CHK has stated repeatedly that it sells Marcellus gas into lucrative citygate markets by virtue of owning firm interstate pipeline capacity contracts.

PHDATA 5628181_1

40.     CHK controls its gas production and sales operations as an integrated business entity, reporting revenues from the subsidiary companies' operations in the Marcellus region as CHK's in CHK's annual report. *See, e.g., id.*; CHK 2014 Annual Report (available for viewing and downloading at http://www.chk.com/investors/financial-information).  CHK's consolidated financial statements include entities and subsidiaries in which it has a controlling financial interest or in which it directly or indirectly holds more than 50% of the stock. *See id.* at 79.  On information and belief, CHK Appalachia's and CEML's revenues are included in CHK's consolidated financial statements.

41.     CHK Appalachia holds CHK's leasehold interests in the Marcellus region.

42.     CHK Appalachia produces the gas from Plaintiffs' properties.  Following extraction, the gas is treated, gathered, and delivered into an interstate pipeline, where it is ready to be delivered to third parties for eventual sale.

43.     CHK Appalachia's affiliated company, CEML, another CHK subsidiary, purportedly handles the marketing of the gas to third parties, selling the gas to them at an interstate pipeline connection or further downstream.  In addition, on information and belief, CEML holds firm contracts for use of gathering system and pipeline transportation capacity.  For example, CEML's pipeline capacity contract on Tennessee Gas Pipeline's 300 line allows CHK to transport gas to NYC citygate. *See, e.g.*, Federal Energy Regulatory Commission: Order Issuing Certificate and Approving Abandonment, issued May 29, 2012 re: Tennessee Gas Pipeline Company LLC at 4 ¶ 6, 5¶ 8, 11 ¶¶ 27, 28, and 13 ¶ 32 (available for viewing and downloading at http://www.ferc.gov/EventCalendar/Files/20120529165448-CP11-161-000.pdf).

PHDATA 5628181_1

44.     CEML generates an increasingly large percentage of CHK's revenues and, on information and belief, profits.  CEML's revenues have increased from approximately $3 billion to approximately $12 billion between 2010 and 2014.  See CHK 2014 Annual Report (available for viewing and downloading at http://www.chk.com/investors/annual-report/financial-review).  This increase comes despite the fact that CHK sold substantially all of its gas gathering assets in a series of transactions between June 8, 2012 and December 11, 2012.  Thus, even as CHK divested its gas gathering systems, its revenues generated from gathering, marketing, and compression increased.

45.     CHK Appalachia pays royalties to Plaintiffs and those similarly situated starting from an alleged weighted average sales price ("WASP") that is purportedly calculated from sales to third parties at downstream locations served by the interstate pipeline.

46.     However, the royalty statements provided by CHK Appalachia to Plaintiffs reflect that CHK takes deductions for various purported post-production services notwithstanding the lease and addendum terms, and the landmen's statements about the meaning of those terms, as though the sale of gas to unaffiliated third parties occurs at the wellhead, before it is delivered into the gathering system that later feeds into the interstate pipeline where CEML sells the gas to third parties.  These deductions have been and, unless enjoined, will be unjustly charged against the royalty payments due to Plaintiffs and the members of the Class.

47.     These deductions are improper because they are expressly disallowed by the leases.  Pursuant to the Addendum Clause, CHK Appalachia is obligated to deliver gas for sale free of cost to the Plaintiffs.

PHDATA 5628181_1

48.     The Plaintiffs' lease forms, like those of other similarly situated lessors, contain specific, standard language governing the calculation of royalties.  The standard form leases require the lessee to calculate royalties based on the sales proceeds it receives.

49.     The leases contain standard language contemplating downstream sales to third parties, obligating the lessee to pay royalties based on "the sales proceeds actually received by Lessee."  The leases do not permit CHK Appalachia to limit royalties artificially by using the expedient of transferring gas to an affiliate such as CEML or otherwise calculating royalties on any basis other than the actual gross sale proceeds received upon sale of the gas to a third party in an arm's length transaction at the point of such sale.

50.     Moreover, when read in conjunction with the royalty provisions, the Addendum Clauses in the leases preclude Chesapeake from deducting any post-production costs.

51.     Expressly altering and superseding the post-production deduction language in the royalty provision,[3] the Addendum Clause provides that the royalties "shall be paid *without deductions* for the costs of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the . . . gas produced from the lease premises ready for sale or use."  (Ex. A, Addendum ¶ 17 (emphasis added).)

---

[3] The lease addendum provides that "[i]n the event of a conflict between a provision contained in this Addendum and a provision contained in the Lease, the provision contained in this addendum prevails." Ex. A. at ¶ 1(a).

PHDATA 5628181_1

52.     Further, the Addendum Clause provides that the "gas royalty shall be delivered *free of cost into the . . . pipeline* (for gas), with the exception of Lessor's prorated share of taxes, measured by volume, on the . . . gas royalty." *Id.* (emphasis added).

53.     Thus, by the express terms of the leases, CHK Appalachia may not take any deductions for post-production services.

54.     On information and belief, CHK Appalachia transfers title to the gas from Plaintiffs' properties to its affiliated marketing company CEML before it is sold in an arm's length transaction at the interstate pipeline (or further downstream).

55.     CHK Appalachia tells lessors that it transfers title to the gas to CEML at the wellhead; however, upon information and belief—and as the Pennsylvania Attorney General has alleged in a recently-filed Unfair Trade Practices enforcement action[4] against CHK and related companies—internal Chesapeake documents and contracts show that the transfer of title actually takes place in the interstate pipeline, where CEML sells the gas (generally at or near a citygate). A copy of a typical letter in which Chesapeake makes this misrepresentation to lessors is attached hereto as Exhibit E.

---

[4] The Attorney General's lawsuit against the Chesapeake companies, filed December 9, 2015, is styled *Commonwealth v. Chesapeake Energy Corp.*, No. 2015IR0069 (Bradford Co. Ct. Common Pleas).

56.     Moreover, as the letter and Chesapeake's own conduct reflects, there is no commercial market at the wellhead.  Rather, the first commercial market exists in the interstate pipeline system.

57.     Accordingly, for purposes of the lease's royalty provision and Addendum Clause, the gas is not sold at the wellhead.  It is sold in the interstate pipeline system.

58.     Despite these facts, CHK Appalachia has deducted purported post-production costs for gathering, compression, and transportation against the royalty payments to Plaintiffs and the members of the Class.

59.     By letter dated September 16, 2015, counsel for the Tylers and their partnerships wrote to CHK Appalachia to challenge the improper deductions, which, as of May 2015, were approximately $500,000.  *See* September 16, 2015 Memorandum from Aaron Hovan to Chesapeake, attached hereto as Exhibit F.

60.     CHK Appalachia refused to correct its breach of the lease.  Instead, CHK Appalachia claims that it is permitted to take the deductions notwithstanding the Addendum Clause because, it claims, the gas is marketable at the wellhead.  It then claims that any costs incurred between the wellhead and the ultimate point of sale are post-production costs permitted by the Addendum Clause because the gas is purportedly ready for sale at the wellhead.  *See* October 16, 2015 letter from CHK counsel Gregory Miller to Aaron Hovan, a copy of which is attached hereto as Exhibit G.

61.     However, CHK Appalachia's reading of the lease renders the Addendum Clause meaningless.  It also reads the language stating that the lessee must deliver the gas to the pipeline free of cost out of the Addendum Clause by claiming that the "pipeline" is the "gathering

pipeline," not the interstate transmission pipeline where the gas is actually sold to third parties.

(*See* Ex. F at 2 ¶ 3.)  The interpretation offered by CHK, under which CHK generates revenue

for itself and its subsidiaries at the expense of the landowners, cannot be, and is not, what the

landowners intended when signing leases including the Addendum Clause guaranteeing that they

would receive royalties without deductions for gas produced from their properties and sold to

third parties.

62.     Contrary to CHK Appalachia's claims, there is no readily available commercial

market for gas at the wellhead.  To the contrary, Chesapeake's business—and the business of its

subsidiaries CHK Appalachia and CEML—is predicated on producing gas at the wellhead and

then selling the gas downstream of the wellhead to unaffiliated third parties at the highest

possible price.

63.     Accordingly, CHK Appalachia breached the lease terms expressly requiring that it

pay royalties free from deductions.

### CHESAPEAKE'S SCHEME RESULTS IN NEGATIVE ROYALTY PAYMENTS TO PLAINTIFFS AT A HIGH POINT IN THE DECLINE CURVE

64.     CHK Appalachia's royalty statements demonstrate that Chesapeake is

manipulating the Addendum Clause to benefit itself at the expense of Plaintiffs and the members

of the Class.

65.     For example, the Mowrys' December 31, 2015 royalty statement reflects

transactions for which *the post-production deductions taken by Chesapeake exceed the*

*Mowrys' royalties in their entirety*, resulting in negative royalties that Chesapeake "zeroes out"

PHDATA 5628181_1

or offsets against the Mowrys' royalties on other transactions. A copy of the Mowrys' December 31, 2015 royalty statement is attached hereto as Exhibit H.

66.     For the "Angie 5H" well, the statement reflects a net payment of $2.45 to the Mowrys. There were sales of 48297.62 Mcf of gas produced from the well in October 2015 (production date 1015), of which 28.37 Mcf were attributable to the Mowrys' interest, at a price of $1.211 per Mcf, for a gross value of $34.35. The deductions for transportation ($23.36), gathering ($10.94 + $2.06), and compression ($1.02 + $0.67) total $38.05, eclipsed the gross value of the gas and resulted in zero royalties for the Mowrys for that month of production.

67.     Similarly, the royalty statement for Tyler 5 Family LP reflects transactions for which the post-production deductions taken by Chesapeake exceed the royalty entirely, resulting in negative royalties that Chesapeake offsets against the Tyler Family 5 LP royalties on other transactions. A copy of the Tyler 5 Family LP December 31, 2015 royalty statement is attached hereto as Exhibit I.

68.     For the "Angie 5H" well, the Tyler 5 Family LP December 31, 2015 statement reflects a credit for fuel attributable to October 2012 production (production date 1012) of $71.82. All values for October 2015 production (production date 1015) were "zeroed" out by CHK Appalachia in light of deductions taken for post-production processing. Therefore, despite producing and selling significant volumes of gas from the property, CHK Appalachia only paid the Tyler 5 Family LP $71.82 attributable to a fuel charge from October 2012. There were no royalties paid on the October 2015 production. If CHK Appalachia had not "graciously" zeroed out the net deduction charges, the net royalty to the Tyler 5 Family LP would have been

PHDATA 5628181_1

negative, effectively calling for the lessor to pay the lessee for extracting and selling gas from the property.

69.     Similarly, for the Tim & Terri Family LP, the December 31, 2015 statement reflects a payment of $71.81 for production from the "Angie 5H" well for October 2015 production (production date 1015). That $71.81 is a credit for fuel attributable to the October 2012 production from the well (production date 1012). All values for October 2015 production (production date 1015) are "zeroed" out by CHK Appalachia in light of deductions taken for post-production processing. Therefore, despite producing and selling significant volumes of gas from the property, CHK Appalachia only paid the Tim & Terri Family LP $71.81 attributable to a fuel charge from October 2012. There were no royalties paid on the October 2015 production. If CHK Appalachia had not zeroed out the net deduction charges, the net royalty to the Tim & Terri Family LP would have been negative. A copy of the Tim & Terri Family LP December 31, 2015 royalty statement is attached hereto as Exhibit J.

70.     The timing of these negative payments is particularly damaging in light of the declining nature of gas well production. A typical Marcellus shale well produces progressively less over its lifetime. The rate at which production drops over the life of the well is called the "decline curve." The fact that the negative royalties are being paid in the Plaintiffs' wells' initial years is significant, as those years are the most significant producing years of any shale well. According to Rusty Braziel, a "steep rate of decline is simply the modus operandi of shale

PHDATA 5628181_1

development and can be expected to be somewhere in the 50-90% range in the first year"[5] and

continuing thereafter. *See* Rusty Braziel "The Domino Effect" at 156.[6] Steep decline curves of

Marcellus shale wells mean that paying negative royalties in the beginning years of a well's

production is much more damaging than in its later years, when production is dramatically lower.

71.    The Tylers are in their third year of production on their wells.

72.    Thus, it is not fair to say that one month in the thirty-year life of a well is like any

other month.  Although each well is different, negative or low price production in the first three

years of a well's life is generally much more damaging than negative or low price production

near the end of a well's life.

73.    An example of negative royalties follows.  The prices and deductions on the Tyler

5 Family LP interest for October 2015 demonstrate that the deductions for purported post-

production services exceed the value of the gas at the stated $1.211 per Mcf stated by CHK

Appalachia:

---

[5] The Chesapeake Defendants have "paid" negative royalties to many lessors who are in the first
or second year of their production profile in 2015, including lessors in at least the Franclaire
East, Franclaire West, Roundwood, Lasher East, Lasher West, Lasher Southwest, Lasher
Southeast, Lasher South, McGavin East, McGavin West, O'Dowd South, and Rosiemar pooled
units.

[6] *See also* http://extension.psu.edu/natural-resources/natural-gas/webinars/pennsylvania-royalty-
calculations-and-decline-curves/pennsylvania-royalty-calculations-and-decline-curves-
powerpoint-april-17-2014.

PHDATA 5628181_1

| Owner Number | Lease Name | Deduction | Owner Volume (Mcf) | Owner Gross | Owner Deduction | Owner Net | Price per Mcf | |
|---|---|---|---|---|---|---|---|---|
| 60197 | ANGIE 5H | Fuel | 985.77 | 1,193.82 | -33.88 | 1,227.70 | **1.34** | Costs per Mcf |
| 60197 | ANGIE 5H | Gathering | 0.00 | 0.00 | 379.95 | -379.95 | 0.39 | |
| 60197 | ANGIE 5H | Compression | 0.00 | 0.00 | 23.12 | -23.12 | 0.02 | |
| 60197 | ANGIE 5H | Compression | 0.00 | 0.00 | 35.63 | -35.63 | 0.04 | |
| 60197 | ANGIE 5H | Gathering | 0.00 | 0.00 | 71.52 | -71.52 | 0.07 | |
| 60197 | ANGIE 5H | Transportation | 0.00 | 0.00 | 811.89 | -811.89 | 0.82[7] | |
| | | | | | | | **-0.13** | Net price per Mcf |
| 60197 | CLAUDE 6H | Fuel | 1,018.66 | 1,235.36 | -10.56 | 1,245.92 | **1.32** | Costs per Mcf |
| 60197 | CLAUDE 6H | Gathering | 0.00 | 0.00 | 385.58 | -385.58 | 0.38 | |
| 60197 | CLAUDE 6H | Compression | 0.00 | 0.00 | 23.46 | -23.46 | 0.02 | |
| 60197 | CLAUDE 6H | Compression | 0.00 | 0.00 | 36.16 | -36.16 | 0.04 | |
| 60197 | CLAUDE 6H | Gathering | 0.00 | 0.00 | 72.59 | -72.59 | 0.07 | |
| 60197 | CLAUDE 6H | Transportation | 0.00 | 0.00 | 823.95 | -823.95 | 0.81 | |
| | | | | | | | **-0.10** | Net price per Mcf |
| 60197 | TYLER SUS 4H | Fuel | 188.80 | 228.36 | -1.34 | 229.70 | **1.31** | Costs per Mcf |
| 60197 | TYLER SUS 4H | Gathering | 0.00 | 0.00 | 71.11 | -71.11 | 0.38 | |
| 60197 | TYLER SUS 4H | Compression | 0.00 | 0.00 | 4.33 | -4.33 | 0.02 | |
| 60197 | TYLER SUS 4H | Compression | 0.00 | 0.00 | 6.67 | -6.67 | 0.04 | |
| 60197 | TYLER SUS 4H | Gathering | 0.00 | 0.00 | 13.38 | -13.38 | 0.07 | |
| 60197 | TYLER SUS 4H | Transportation | 0.00 | 0.00 | 151.91 | -151.91 | 0.80 | |

[7] It is notable that transportation charges assessed to landowners are $0.82/Mcf. An Mcf is roughly equivalent to a Dth. Since CHK pays .4450 per Dth to get to citygate, it is unclear how charging almost double that amount is fair or reasonable. *See, e.g.*, Federal Energy Regulatory Commission: Order Issuing Certificate and Approving Abandonment, issued May 29, 2012 re: Tennessee Gas Pipeline Company LLC at 4 ¶ 6, 5¶ 8, 11 ¶¶ 27, 28, and 13 ¶ 32 (available for viewing and downloading at http://www.ferc.gov/EventCalendar/Files/20120529165448-CP11-161-000.pdf).

PHDATA 5628181_1

| Owner Number | Lease Name | Deduction | Owner Volume (Mcf) | Owner Gross | Owner Deduction | Owner Net | Price per Mcf |
|---|---|---|---|---|---|---|---|
| | | | | | | -0.10 | Net price per Mcf |

74.     CHK charges these claimed expenses for post-production services out of landowners' royalties despite the lease terms, thereby generating revenue for the Chesapeake Defendants at the expense of the landowners.

75.     The resulting situation, in which CHK generates revenue for itself and its subsidiaries at the expense of the landowners, is contrary to the lease terms. Moreover, it cannot be, and is not, what the parties intended when signing leases including the Addendum Clause at issue. This clause guarantees, as landmen like Mr. Strineka plainly and repeatedly stated, that lessors would receive royalties without cost for gas produced from their properties and sold to third parties.

### THE CHESAPEAKE DEFENDANTS SUDDENLY CEASE COOPERATING WITH THE AUDIT GROUP AFTER THE AUDIT REVEALS THAT THEY HAD MISCALCULATED ROYALTIES

76.     After reviewing the relevant corporate records, the Audit Group's auditor, Mary Ellen Denomy, prepared an audit letter exception report dated March 22, 2015, and a corrected audit letter exception report dated May 13, 2015, that demonstrated that the Chesapeake Defendants had miscalculated royalty payments to the Tylers and those similarly situated. These royalty payments are incorrect even if one assumes that the Chesapeake Defendants' position with regard to deductions of post-production costs from royalty payments were correct, which it is not.

77.     The audit exception letter identified that the Chesapeake Defendants were underreporting gas volumes and prices, among other things.

78.     The Chesapeake Defendants' miscalculations resulted in underpayment of royalties to the members of the Audit Group.

79.     When the Audit Group sought a response to the audit letter exception reports, the Chesapeake Defendants refused. In a letter dated January 25, 2016, CHK took the position that, in light of the Attorney General's lawsuit against the Chesapeake Defendants, referenced *supra* at ¶ 55, it would no longer cooperate and would not respond to the audit letter exception reports prepared on behalf of the Tylers and those similarly situated. *See* January 25, 2016 letter from Steve Armstrong to M.E. Denomy, attached hereto as Exhibit K.

80.     Accordingly, the Chesapeake Defendants have not corrected the underpayment of royalties exposed by the Audit Group and Ms. Denomy's exception reports and refuse to do so.

### CLASS DEFINITIONS AND CLASS ALLEGATIONS

81.     Plaintiffs bring Counts I through VII of this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of themselves and on behalf of other lessors who entered into any lease in the Marcellus Region in which the Chesapeake Defendants have an interest or have acquired an interest that states: "Royalties shall be paid without deductions for the costs of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the oil and/or gas produced from the lease premises ready for sale or use. All oil and/or gas royalty shall be delivered free of cost into the tank or pipeline (for oil) and into the pipeline (for gas) with the exception of Lessor's prorated share of taxes, measured by volume, on the oil and/or gas royalty." This is the "Deductions Class."

82.     In addition, Plaintiffs bring Count VIII of this action pursuant to Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief on behalf of themselves and all other lessors who hold an interest in a lease in which the Chesapeake Defendants have an interest or have acquired an interest in the Marcellus Region. This is the "Negative Royalty Class."

83.     Further, Plaintiffs bring Count IX of this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) for declaratory relief on behalf of themselves and all other lessors who are members of the Audit Group. This is the "Audit Group Class."

84.     Each such Class is so numerous that joinder of separate claims on behalf of all members is impracticable. The Chesapeake Defendants' conduct affects hundreds of lessors with leases in which the Chesapeake Defendants have or have acquired an interest.

85.     There are questions of law or fact common to each class. The Chesapeake Defendants' course of conduct affects Plaintiffs and other situated lessors similarly, and whether that conduct violates and breaches the requirements of the leases is a question common to the class.

86.     With respect to Counts I through VII and Count IX, common questions predominate over any individual issues, since CHK Appalachia is subject to standard lease terms that apply equally to all members of the Class. These predominating questions include, without limitation, whether CHK Appalachia has complied with its obligations to pay royalties based on the terms of the leases, whether it has engaged in a scheme with affiliate companies that depresses Class members' royalty payments, and whether Class members have been damaged by its conduct.

23                          PHDATA 5628181_1

87.     The claims or defenses of the representative parties are typical of the claims or defenses of the Class.  Plaintiffs are not subject to any unique defenses that would render their claims atypical of those of other Class members.

88.     The Plaintiffs will adequately protect the interests of the Classes.

89.     Plaintiffs' counsel has significant class action experience and will fairly and adequately protect the interests of the Classes.

90.     With regard to the Deductions Class, each Class member has a lease agreement containing an Addendum Clause that is substantially similar to that signed by the Plaintiffs.

91.     With respect to Count VIII, Count IX, and Count X each Class member has a lease agreement in which the Chesapeake Defendants have or have acquired an interest.  The Chesapeake Defendants have acted or refused to act on grounds identical to all Class members, thus making classwide injunctive and declaratory relief appropriate.

92.     Plaintiffs anticipate that there will be no difficulties in managing this case as a class action.  Class members can be ascertained from the Chesapeake Defendants' records and damages can be calculated based on those records.

## CAUSES OF ACTION

### COUNT I—BREACH OF CONTRACT – CHK APPALACHIA
### (ON BEHALF OF THE DEDUCTIONS CLASS)

93.     Plaintiffs incorporate the allegations of paragraphs 1-92 above as if fully set forth herein.

          PHDATA 5628181_1

94.     Plaintiffs and Class members own interests in leases, which are contracts pursuant to which CHK Appalachia owed and owes royalties for the production and sale of Plaintiffs' and Class members' natural gas.

95.     In breach of the lease terms, CHK Appalachia improperly took deductions for purported post-production services in contravention of the express terms of the leases.

96.     Plaintiffs and Class members have been damaged as a result of CHK Appalachia's breach of the lease agreements and are entitled to judgment against it in the amount of their actual damages, statutory or other interest at the maximum allowable rate, attorneys' fees, costs of suit, and any further relief the Court deems appropriate.

### COUNT II – BREACH OF 1) IMPLIED DUTIES OF GOOD FAITH AND FAIR DEALING AND 2) IMPLIED COVENANT TO DEVELOP AND OPERATE LEASEHOLD FOR THE MUTUAL BENEFIT OF THE LESSOR AND LESSEE – CHK APPALACHIA (ON BEHALF OF THE DEDUCTIONS CLASS)

97.     Plaintiffs incorporate the allegations of paragraphs 1-96 above as if fully set forth herein.

98.     At all times, CHK Appalachia owed Plaintiffs and other Class members an implied duty of good faith and fair dealing.

99.     At all times, CHK Appalachia owed Plaintiffs and other Class members an implied duty to operate the leasehold for the mutual benefit of lessors and lessees, including Plaintiffs and other Class members.

100.    CHK Appalachia's conduct taking improper deductions and using affiliate companies to enhance CHK's profits and revenues at the expense of Plaintiffs and those similarly situated breached the duty of good faith and fair dealing and the duty to operate the

PHDATA 5628181_1

leases for the mutual benefit of Plaintiffs that CHK Appalachia owed Plaintiffs and Class members as a matter of law.

101. CHK Appalachia's reported sales of gas that yielded negative royalties to Plaintiffs demonstrate that it is not operating the leased premises for the mutual benefit of the Plaintiffs. In doing so, CHK Appalachia is producing and selling gas from Plaintiffs' properties in a manner that benefits the Chesapeake Defendants giving the Plaintiffs no benefit whatsoever.

102. Accordingly, Plaintiffs and Class members are entitled to their actual damages, statutory or other interest at the maximum allowable rate, attorneys' fees, costs of suit, and any further relief the Court deems appropriate.

### COUNT III – BREACH OF THE PENNSYLVANIA OIL AND GAS LEASE ACT – CHK APPALACHIA (ON BEHALF OF THE DEDUCTIONS CLASS)

103. Plaintiffs incorporate the allegations of paragraphs 1-102 above as if fully set forth herein.

104. CHK Appalachia's conduct violates the Pennsylvania Oil and Gas Lease Act, 58 P.S. § 33 ("OGLA"), to the extent that it has resulted in Plaintiffs receiving less than the minimum 12.5% royalty guaranteed by law. This is particularly evident where deductions taken against royalties meet or exceed the price used to calculate royalty payments. Put differently, no law, statute, or dictionary definition can reasonably be construed to reconcile "guaranteed minimum royalty" with the zero royalty paid by CHK. "Guaranteed Minimum" is simply mathematically incompatible with zero or a negative figure.

105. In addition, because deductions of post-production costs are prohibited by the leases, CHK initially violated the OGLA in every instance in which it assessed deductions

against royalty payments and paid less than a 12.5% royalty on the gross sale proceeds. CHK further violated the OGLA in all instances in which it later offset a "negative royalty" from one month against a subsequent royalty payment. In such situations, each offset constitutes an additional violation of the OGLA to the extent it results in the royalty payment against which it is charged to fall below the 12.5% guaranteed minimum royalty.

106.    Accordingly, Plaintiffs and Class members are entitled to their actual damages, statutory or other interest at the maximum allowable rate, attorneys' fees, costs of suit, and any further relief the Court deems appropriate.

### COUNT IV – TORTIOUS INTERFERENCE WITH EXISTING CONTRACT – CHK AND CEML
### (ON BEHALF OF THE DEDUCTIONS CLASS)

107.    Plaintiffs incorporate the allegations of paragraphs 1-106 above as if fully set forth herein.

108.    Plaintiffs' leases represent contracts with CHK Appalachia.

109.    Without privilege or justification, CHK and CEML have acted purposefully to harm this contractual relationship by requiring CHK Appalachia to deduct purported post-production costs from royalty payments to Plaintiffs, thereby causing CHK Appalachia to breach the contracts, resulting in monetary damages and depriving Plaintiffs of the benefit of the bargains represented by the leases while improperly benefitting CHK and CEML.

110.    CHK Appalachia breached the existing contract as a result of interference by CHK and CEML.

111.    Accordingly, Plaintiffs and Class members are entitled to their actual damages, statutory or other interest at the maximum allowable rate, attorneys' fees, costs of suit, and any further relief the Court deems appropriate.

### COUNT V – UNJUST ENRICHMENT – CHK AND CEML
### (ON BEHALF OF THE DEDUCTIONS CLASS)

112.    Plaintiffs incorporate the allegations of paragraphs 1-111 above as if fully set forth herein.

113.    CHK and CEML have received benefits from Plaintiffs by accepting and realizing revenues from the sale of gas on which CHK Appalachia improperly charged post-production costs against the royalties due to Plaintiffs and members of the Class.

114.    Under the circumstances, it would be unjust to permit CHK and CEML to retain such benefits without payment of value to Plaintiffs and all Class members.

115.    Accordingly, Plaintiffs and all Class members are entitled to their actual damages, statutory or other interest at the maximum allowable rate, attorneys' fees, costs of suit, and any further relief the Court deems appropriate.

### COUNT VI – MONEY HAD AND RECEIVED – ALL DEFENDANTS
### (ON BEHALF OF THE DEDUCTIONS CLASS)

116.    Plaintiffs incorporate the allegations of paragraphs 1-115 above as if fully set forth herein.

117.    Chesapeake has compelled Plaintiffs and members of the Class to pay money for purported post-production services by deducting that money from their royalties on natural gas extracted and sold from their properties.

PHDATA 5628181_1

118.    Chesapeake has appropriated the benefit of these payments and the natural gas under circumstances in which the Defendants know that they are not entitled to such benefits, particularly in light of the Addendum Clause in the leases of Plaintiffs and members of the Class.

119.    Chesapeake has given insufficient consideration for the benefits it received from Plaintiffs and members of the Class, most particularly observable when the purported post-production services resulted in negative royalties to them.

120.    Accordingly, Plaintiffs and all Class members are entitled to return of the money deducted by CHK Appalachia, statutory or other interest at the maximum allowable rate, attorneys' fees, costs of suit, and any further relief the Court deems appropriate

### COUNT VII – INJUNCTIVE RELIEF – ALL DEFENDANTS
### (ON BEHALF OF THE DEDUCTIONS CLASS)

121.    Plaintiffs incorporate the allegations of paragraphs 1-120 above as if fully set forth herein.

122.    The Chesapeake Defendants continues to violate their obligations to Plaintiffs and those similarly situated under their leases.

123.    Unless the Chesapeake Defendants are ordered to desist from their practice of benefitting CHK by improperly taking deductions of purported post-production expenses, the Chesapeake Defendants will continue to cause harm to Plaintiffs and Class members.

124.    The Chesapeake Defendants will suffer less harm if they are ordered to desist from the practice of improperly taking deductions for purported post-production expenses against the royalties owed to Plaintiffs and Class members under the express terms of the leases than Plaintiffs and Class members will suffer if such improper practices are not enjoined.

PHDATA 5628181_1

125.    Enjoining the Chesapeake Defendants from continuing their practice of taking improper deductions against Plaintiffs' and Class members' royalty payments will not harm the public interest. To the contrary, it will advance the public interest by ensuring that the Chesapeake Defendants comply with their legal obligations.

126.    Plaintiffs and the Class members have no adequate remedy at law to prevent the Chesapeake Defendants from continuing their practice of taking improper deductions for purported post-production costs against their royalty payments.

## COUNT VIII – DECLARATORY AND INJUNCTIVE RELIEF – ALL DEFENDANTS
## (ON BEHALF OF THE NEGATIVE ROYALTY CLASS)

127.    Plaintiffs incorporate the allegations of paragraphs 1-126 above as if fully set forth herein.

128.    With regard to gas production, the Chesapeake Defendants' lawyer represented that, in accordance with the reasonable operator standard, "[m]any producers, including Chesapeake, are curtailing or shutting-in production because of lower natural gas prices." Ex. E. However, the Chesapeake Defendants have blatantly disregarded and violated this principle.

129.    In any transaction in which the Chesapeake Defendants' costs meet or exceed the price achieved for the gas, resulting in zero royalties or negative royalties for Plaintiffs and the members of the Class, the Chesapeake Defendants are, by definition, violating their duty to Plaintiffs and other Class members to conduct "prudent operations" and to act as a "prudent operator" in the manner the Chesapeake Defendants' lawyer represented by shutting in wells or in any other way ceasing production when the costs of producing and selling gas meet or exceed the obtainable sales price.

PHDATA 5628181_1

130.    Plaintiffs and members of the Class are entitled to a declaration pursuant to 28

U.S.C. § 2201 that the Chesapeake Defendants' practice of extracting gas and selling gas from

Plaintiffs' and the Class members' properties in transactions in which their costs meet or exceed

the sales prices achieved violates the prudent operator duty and results in waste.

131.    Unless the Chesapeake Defendants are ordered to desist from their practice of

violating the prudent operator duty by extracting gas from the properties of Plaintiffs and those

similarly situated and selling that gas in transactions in which their costs exceed the sales prices,

the Chesapeake Defendants will continue to cause harm to Plaintiffs and Class members by

selling gas from their properties without any compensation to Plaintiffs and Class members.

132.    The Chesapeake Defendants will suffer less harm than Plaintiffs and Class

members if they are ordered to desist from their practice of violating the prudent operator duty

and committing waste by extracting gas from the properties of Plaintiffs and those similarly

situated and selling that gas in transactions in which their costs exceed the sales prices achieved.

133.    Enjoining the Chesapeake Defendants from continuing their practice of violating

the prudent operator duty and committing waste by extracting gas from Plaintiffs' and the Class

members' properties for sale in transactions in which their costs exceed the sales prices achieved

will not harm the public interest.  To the contrary, it will advance the public interest by ensuring

that the Chesapeake Defendants comply with their legal obligations.

134.    Plaintiffs and the Class members have no adequate remedy at law to prevent the

Chesapeake Defendants from continuing their practice of violating the prudent operator duty and

committing waste by extracting gas from their properties and selling that gas in transactions in

which their costs exceed the sales prices achieved.

PHDATA 5628181_1

### COUNT IX – DECLARATORY RELIEF – ALL DEFENDANTS
### (ON BEHALF OF AUDIT GROUP CLASS)

135.    Plaintiffs incorporate the allegations of paragraphs 1-134 above as if fully set forth herein.

136.    The audit of the Chesapeake Defendants' corporate records performed on behalf of the Audit Group demonstrated that the Chesapeake Defendants' miscalculated royalty payments they did pay to Plaintiffs and those similarly situated by, among other things, underreporting gas volumes and prices, resulting in underpayment of royalties to the members of the Audit Group.

137.    Plaintiffs and the Class are entitled to a declaration pursuant to 28 U.S.C. § 2201 that the Chesapeake Defendants have miscalculated and underpaid royalties to the members of the Audit Group in breach of their leases as documented in the audit letter exception reports prepared on behalf of the Audit Group.

138.    Plaintiffs and the Class are further entitled to a declaration that the Chesapeake Defendants owe Plaintiffs and the Class money damages as a consequence of their miscalculation and underpayment of royalties as documented in the audit letter exception reports prepared on behalf of the Audit Group.

### COUNT X – ACCOUNTING – ALL DEFENDANTS
### (ON BEHALF OF ALL CLASSES)

139.    Plaintiffs incorporate the allegations of paragraphs 1-138 above as if fully set forth herein.

140.    In light of the Chesapeake Defendants' inequitable conduct, including unjustly enriching themselves at Plaintiffs' expense, Plaintiffs and the members of the Classes are entitled

PHDATA 5628181_1

to an accounting of all sales of gas, post-production charges, royalty payments, and revenues derived from the sales of gas from their properties.

## JURY DEMAND

Plaintiffs demand trial by jury on all counts for which a jury trial is permitted.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Classes, pray for the following relief:

a. An order certifying a Class of lessors who entered into any lease in the Marcellus Region in which the Chesapeake Defendants have an interest or have acquired an interest that states, in substance: "Royalties shall be paid without deductions for the costs of producing, gathering, storing, separating, treating, dehydrating, compressing, transporting, or otherwise making the oil and/or gas produced from the lease premises ready for sale or use. All oil and/or gas royalty shall be delivered free of cost into the tank or pipeline (for oil) and into the pipeline (for gas) with the exception of Lessor's prorated share of taxes, measured by volume, on the oil and/or gas royalty";

b. An order certifying a Rule 23(b)(2) Class of lessors who hold an interest in a lease in the Marcellus Region in which Chesapeake has or has acquired an interest;

c. An order certifying a Rule 23(b)(2) and/or Rule 23(b)(3) Class of lessors who are members of the Audit Group;

d. A judgment awarding Plaintiffs and the Class their actual damages, punitive damages on Counts II and IV, statutory or other interest at the maximum allowable rate, attorneys' fees, and costs of suit;

e. An order enjoining the Chesapeake Defendants from engaging in further wrongful conduct regarding improper assessment of post-production costs;

f. With regard to the Negative Royalty Class, a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Chesapeake Defendants' practice of extracting gas from Class members' properties for sale in transactions in which costs exceed price violates the prudent operator standard and constitutes waste;

g. With regard to the Negative Royalty Class, an order enjoining the Chesapeake Defendants from engaging in violations of the prudent operator standard or committing waste by extracting or selling gas from Class members' properties for sale in transactions in which costs exceed price;

h. With regard to the Audit Group Class, a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Chesapeake Defendants have miscalculated and underpaid royalties to the members of the Class;

i. With regard to the Audit Group Class, a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Chesapeake Defendants owe Plaintiffs and the Class money damages as a consequence of their miscalculation and underpayment of royalties to members of the Class;

j. An order requiring an accounting; and

34

k.  Any further relief the Court deems appropriate.

/s/ Ira Neil Richards
Ira Neil Richards (PA 50879)
Kenneth I. Trujillo (PA 46520)
Arleigh P. Helfer III (PA 84427)
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Voice: (215) 751-2000
Fax: (215) 751-2205
irichards@schnader.com

Aaron D. Hovan (PA 308412)
154 Warren Street
Tunkhannock, PA 18657
(570) 836-3121

Richard L. Huffsmith (PA 78895)
28 East Tioga Street
Tunkhannock, PA 18657
(570) 240-4400

Richard D. Greenfield (PA 9669)
Greenfield & Goodman LLC
250 Hudson Street, 8th Floor
New York, NY 10013
(917) 495-4446
whitehatrdg@earthlink.net

*Counsel for Plaintiffs*
*and the Classes*

PHDATA 5628181_1